## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISIDORE MENDELOVITZ, Derivatively and On Behalf of Nominal Defendant EXPRESS SCRIPTS, INC.,<br><br>Plaintiff,<br><br>v.<br><br><br><br>GARY G. BENANAV, FRANK J. BORELLI, NICHOLAS J. LAHOWCHIC, THOMAS P. MAC MAHON, JOHN O. PARKER, GEORGE PAZ, SAMUEL K. SKINNER, SEYMOUR STERNBERG, BARRETT A. TOAN, and HOWARD L. WALTMAN,<br><br>Defendants,<br><br>And<br><br>EXPRESS SCRIPTS, INC., a Delaware Corporation,<br><br>Nominal Defendant. | **Civil Action No.:04 CV 8610 (RJH)**<br><br>**ECF Case**<br><br><br><br>**DERIVATIVE COMPLAINT AND JURY DEMAND** |

Plaintiff, Isidore Mendelovitz, residing at Brooklyn, NY, by his attorneys, submits this Derivative Complaint against the defendants named herein and alleges on information and belief, except as to those allegations that pertain to plaintiff, which are alleged on personal knowledge, as follows:

### NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Express Scripts, Inc. ("Express Scripts" or the

"Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment that occurred between October 29, 2003 to August 3, 2004 (the "Relevant Period") and that have caused substantial losses to Express Scripts and other damages, such as its reputation and goodwill.

## JURISDICTION AND VENUE

2.   This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and there is complete diversity of the parties.

3.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein occurred in substantial part in this District.

4.   In connection with the acts alleged in this Complaint, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

5.   Plaintiff is, and was at all relevant times, a shareholder of Express Scripts.

6.   Nominal Defendant Express Scripts is a Delaware

corporation and is one of the largest pharmacy benefit management ("PBM") in North America.  The Company provides a full range of pharmacy benefit management services, including retail drug card programs, mail pharmacy services, drug formulary management programs and other clinical management programs for approximately 16,000 client groups that include HMOs, health insurers, third-party administrators, employers, union-sponsored benefit plans and government health programs.  As of January 1, 2003, some of the Company's largest clients included United HealthCare Insurance Company which manages the AARP Pharmacy Service, Blue Cross Blue Shield of Massachusetts, Blue Shield of California, Mutual of Omaha, the State of Georgia, Mid Atlantic Medical Services Inc., Group Health Incorporated and effective, March 2003, the Department of Defense ("DoD") TRICARE Management Activity.

**Defendants**

7.    Defendant Gary G. Benanav ("Benanav") was elected a director of the Company in January 2000.  Defendant Benanav is also Vice Chairman and Executive Officer New York Life Insurance Company, a life insurance and financial services company, since November 1999.  He was Executive Vice President of New York Life from December 1997 until November 1999.  He is also a director of New York Life.  New York Life Insurance Company owns 15.03% of Express Scripts common shares.  He knew or was reckless in not

knowing of the adverse information about Express Scripts'
business and practices regarding the Company's issuance of false
and misleading statements and other illegal practices, including,
but not limited to, the Company's violation of civil law by
pocketing rebates it obtained from drug companies instead of
returning them to the State of New York and inflating the cost of
generic drugs and inducing physicians to switch patients'
prescriptions so it could charge fees to new drug providers.  He
is not disinterested, is not independent, and cannot fairly and
appropriately respond to any shareholder demand.

    8.   Defendant Frank J. Borelli ("Borelli") was elected a
director of the Company in January 2000.  Defendant Borelli is
the Chair of the Company's Audit Committee.  Defendant Borelli
has been Senior Advisor of Marsh & McLennan Companies ("M&MC"), a
global professional services firm, since retiring in January
2001.  Defendant Borelli was Senior Vice President and a director
of M&MC from October 1984 until January 2001, and was also Chief
Financial Officer of M&MC from October 1984 until January 2000.
Mr. Borelli is also a director of The Interpublic Group of
Companies Inc.  He knew or was reckless in not knowing of the
adverse information about Express Scripts' business and practices
regarding the Company's issuance of false and misleading
statements and other illegal practices, including, but not
limited to, the Company's violation of civil law by pocketing

4

rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers.  He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

9.   Defendant Nicholas J. LaHowchic ("LaHowchic") was elected a director of the Company in July 2001.  He is a member of the Company's Compensation & Development Committee and Chairman of the Company's Compliance Committee.  Defendant LaHowchic has been President and Chief Executive Officer of Limited Logistics Services, Inc. ("LLS") since October 1997.  He knew or was reckless in not knowing of the adverse information about Express Scripts' business and practices regarding the Company's issuance of false and misleading statements and other illegal practices, including, but not limited to, the Company's violation of civil law by pocketing rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers.  He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

10.  Defendant Thomas P. MacMahon ("MacMahon") was elected a

director of the Company in March 2001.  Defendant MacMahon is a
member of the Company's Audit Committee.  Defendant MacMahon has
served as President and Chief Executive Officer and a member of
the Executive and Management Committees of Laboratory Corporation
of America Holdings ("LabCorp"), the second largest independent
clinical laboratory company in the U.S., since January 1997.
Defendant MacMahon has been a director of LabCorp since April
1995, serving as Chairman of the Board since April 1996.  He knew
or was reckless in not knowing of the adverse information about
Express Scripts' business and practices regarding the Company's
issuance of false and misleading statements and other illegal
practices, including, but not limited to, the Company's violation
of civil law by pocketing rebates it obtained from drug companies
instead of returning them to the State of New York and inflating
the cost of generic drugs and inducing physicians to switch
patients' prescriptions so it could charge fees to new drug
providers.  He is not disinterested, is not independent, and
cannot fairly and appropriately respond to any shareholder
demand.

11.  Defendant John O. Parker ("Parker") was elected a
director of the Company in July 2001.  Defendant Parker is a
member of the Company's Compliance and Corporate Governance
committees.  Defendant Parker has served as a Venture Partner
with Rho Ventures LLC, a venture capital firm, since January

2002.  Defendant Parker was a General Partner of Care Capital, LLC, a venture capital firm, from October 2000 to December 2001, and was Senior Vice President and Director of Information Resources of Smithkline Beecham Corporation from November 1991 to September 2000.  He knew or was reckless in not knowing of the adverse information about Express Scripts' business and practices regarding the Company's issuance of false and misleading statements and other illegal practices, including, but not limited to, the Company's violation of civil law by pocketing rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers.  He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

12.  Defendant George Paz ("Paz") was elected a director of the Company in January 2004.  Defendant Paz was elected President of the Company in October 2003.  Defendant Paz joined the Company and was elected Senior Vice President and Chief Financial Officer in January 1998.  Defendant Paz has continued to serve as the Company's Chief Financial Officer of the Company following his election to the office of President until his successor joined the Company in April 2004.  He knew or was reckless in not knowing of the adverse information about Express Scripts'

7

business and practices regarding the Company's issuance of false
and misleading statements and other illegal practices, including,
but not limited to, the Company's violation of civil law by
pocketing rebates it obtained from drug companies instead of
returning them to the State of New York and inflating the cost of
generic drugs and inducing physicians to switch patients'
prescriptions so it could charge fees to new drug providers.  He
is not disinterested, is not independent, and cannot fairly and
appropriately respond to any shareholder demand.

13.    Defendant Samuel K. Skinner ("Skinner") was elected a
director of the Company in February 2004.  Defendant Skinner is a
member of the Compliance Committee.  Defendant Skinner served as
President, Chief Executive Officer and a director of USF
Corporation (formerly USFreightways Corporation)("USF"), a
transportation, freight forwarding and supply chain management
company from 2000 until his retirement in 2003.  Defendant
Skinner was also Chairman of the Board of USF from 2001 until his
retirement.  From October 1998 through 2000, defendant Skinner
served as Capital Partner & Co-Chairman of Hopkins & Sutter, a
Chicago-based law firm.  Defendant Skinner is also a director of
Navigant Consulting, Inc., Midwest Air Group, Inc., Click
Commerce, Inc., DiamondCluster International, Inc., Dade Behring
Holdings, Inc., and APAC Customer Service, Inc.  He knew or was
reckless in not knowing of the adverse information about Express

Scripts' business and practices regarding the Company's issuance of false and misleading statements and other illegal practices, including, but not limited to, the Company's violation of civil law by pocketing rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers. He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

14.   Defendant Seymour Sternberg ("Sternberg") was elected a director of the Company in March 1992. Defendant Sternberg currently is the Chairman and Chief Executive Officer of New York Life Insurance Company, a life insurance and financial services company, and has served in this capacity since April 1997. From October 1995 until October 2002, he was the President of New York Life, and from October 1995 until March 1997 he also held the position of Chief Operating Officer of New York Life. Defendant Sternberg is also a director/manager of various New York Life subsidiaries. New York Life Insurance Company owns 15.03% of Express Scripts common shares. Defendant Sternberg is also a member of the Company's Compliance and Corporate Governance committees. He knew or was reckless in not knowing of the adverse information about Express Scripts' business and practices regarding the Company's issuance of false and misleading

statements and other illegal practices, including, but not
limited to, the Company's violation of civil law by pocketing
rebates it obtained from drug companies instead of returning them
to the State of New York and inflating the cost of generic drugs
and inducing physicians to switch patients' prescriptions so it
could charge fees to new drug providers.  He is not
disinterested, is not independent, and cannot fairly and
appropriately respond to any shareholder demand.

15.  Defendant Barrett A. Toan ("Toan") was elected Chairman
of the Board of the Company in November 2000, Chief Executive
Officer in March 1992, and a director in October 1990.  Defendant
Toan has been an executive employee of the Company since May 1989
and served as President of the Company from October 1990 to April
2002.  Defendant Toan is also an officer and director of several
of the Company's subsidiaries.  He knew or was reckless in not
knowing of the adverse information about Express Scripts'
business and practices regarding the Company's issuance of false
and misleading statements and other illegal practices, including,
but not limited to, the Company's violation of civil law by
pocketing rebates it obtained from drug companies instead of
returning them to the State of New York and inflating the cost of
generic drugs and inducing physicians to switch patients'
prescriptions so it could charge fees to new drug providers.  He
is not disinterested, is not independent, and cannot fairly and

appropriately respond to any shareholder demand.

16.   Defendant Howard L. Waltman ("Waltman") has been a director of the Company since its inception in September 1986, and served as Chairman of the Board of the Company from March 1992 until November 2000.  Defendant Waltman is Chairman of the Company's Compensation & Development Committee and Corporate Governance Committee.  He knew or was reckless in not knowing of the adverse information about Express Scripts' business and practices regarding the Company's issuance of false and misleading statements and other illegal practices, including, but not limited to, the Company's violation of civil law by pocketing rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers.  He is not disinterested, is not independent, and cannot fairly and appropriately respond to any shareholder demand.

17.   Maura C. Breen ("Breen") is a director of the Company. She is not named as a defendant because the Company has recently appointed her as a director.  Prior to her current position, Ms. Breen was senior vice president and chief marketing officer of Verizon's Retail Markets Group, where she was instrumental in developing and delivering industry leading communications packages.  She was also group president of Verizon Long Distance,

which she helped launch.  Under her leadership it acquired 39%
line share in three years. Ms. Breen began her career with New
England Telephone Company, moving to NYNEX in 1990.

18.  The defendants identified in ¶¶ 7-16 are referred to
herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19.  By reason of their positions as officers, directors,
and/or fiduciaries of Express Scripts and because of their
ability to control the business and corporate affairs of Express
Scripts, the Individual Defendants owed Express Scripts and its
shareholders fiduciary obligations of trust, loyalty, good faith
and due care, and were and are required to use their utmost
ability to control and manage Express Scripts in a fair, just,
honest and equitable manner.  The Individual Defendants were and
are required to act in furtherance of the best interest of
Express Scripts and its shareholders so as to benefit all
shareholders equally and not in furtherance of their personal
interest or benefit.

20.  Each director and officer of the Company owes to
Express Scripts and its shareholders the fiduciary duty to
exercise good faith and diligence in the administration of the
affairs of the Company and in the use and preservation of its
property and assets, and the highest obligations of fair dealing.
In addition, as officers and/or directors of a publicly held

company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

21.  The Individual Defendants, because of their positions of control and authority as directors and/or officers of Express Scripts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of the advisory, executive, managerial or directorial positions with Express Scripts, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and improper representations of Express Scripts.

22.  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Express Scripts, and was at all times acting within the course and scope of such agency.

23.  To discharge their duties, the officers and directors of Express Scripts were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of

such duties, the officers and directors of Express Scripts were required to, among other things:

(a)   refrain from acting upon material inside corporate information to benefit themselves;

(b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)   remain informed as to how Express Scripts conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take

steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with the applicable federal, state and local laws, rules and regulations.

24.  Each Individual Defendant, by virtue of his position as director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Express Scripts, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of the Express Scripts Board during the Relevant Period.

25.  The Individual Defendants breached their duties of

15

loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein, *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  In addition, the Company is also subject to a lawsuit by the Attorney General in the State of New York concerning the management of the New York State employee pharmacy benefit program.  As a result, Express Scripts has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)   Costs incurred in investigating and defending Express Scripts and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

26.  Moreover, these actions have irreparably damaged Express Scripts's corporate image and goodwill.  For at least the foreseeable future, Express Scripts will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have

misled the investing public, such that Express Scripts's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

27.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in the breach of their respective duties.

28.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Express Scripts and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Express Scripts, regarding the Individual Defendants' management of Express Scripts's operations, the Company's financial health and

17

stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took actions set forth herein.

29.  The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 2003 and continuing thereafter.  During this time, the Individual Defendants caused the Company to conceal the true fact that Express Scripts was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Express Scripts's financial performance and future business prospects, as alleged herein.

30.  The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Express Scripts common stock so they could protect and enhance their executive and directorial positions and simultaneously obtain larger bonuses

which were directly tied to the performance of Express Scripts.

31.  The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained herein.

32.  Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

### KNOWLEDGE OF GENERAL STANDARDS OF INTERNAL CONTROL AND CORPORATE COMPLIANCE

33.  As sophisticated business executives with extensive financial services industry experience and expertise, the Individual Defendants were each aware of fundamental concepts of internal controls as applied to complex business organizations, as well as of the importance of adequate and effective systems to assure corporate compliance with applicable laws and regulations.

34.   Although issues of internal control and corporate compliance had received extensive congressional, regulatory, industry and public attention in the 1970s and 1980s, in the early 1990s, two developments directly pertaining to organizational governance clearly and unambiguously established the crucial responsibilities of corporate directors in these critical areas.

**Sentencing Guidelines**

35.   First, pursuant to the Sentencing Reform Act of 1984, in 1991 the United States Sentencing Commission adopted the Organization Sentencing Guidelines (the "Sentencing Guidelines"). The Sentencing Guidelines set forth a uniform structure for sentencing organizations of federal criminal statutes, creating powerful incentives for corporations to have in place effective compliance programs, and establishing minimum criteria for evaluating such programs.

36.   The Sentencing Guidelines have garnered wide-spread support and recognition.  Delaware law specifically recognizes, in the context of defining the oversight duties of corporate directors, that in order to attend in good faith to their fiduciary responsibilities, directors must take into account the Sentencing Guidelines standards for corporate compliance programs.

37.   Among the minimum for an effective compliance program

under the Sentencing Guidelines are:

> Standards and procedures to be followed by
> employees and other agents that are
> reasonably capable of reducing the prospects
> of illegal conduct;

> Assignment of overall responsibility to
> oversee compliance with such standards and
> procedures to high-level personnel;

> Utilization of monitoring and auditing
> systems reasonably designed to detect illegal
> conduct by employees and other agents;

> Having in place a reporting system employees
> and other agents could report illegal conduct
> without fear of retribution;

> Consideration of the prior compliance history
> of the company; and

> Ensuring that the company's compliance
> incorporates and follows standards called for
> by any applicable government regulation.

38.  These explicit criteria support the common-sense proposition that directors, in performing their compliance oversight function, must satisfy themselves that the corporation's compliance program is appropriately designed to address the compliance risks arising from the nature of the company's business and its specific compliance history, and must ensure that the company employs a system of monitoring and auditing that will provide them with reasonable assurance that the compliance program is in fact operating effectively.

**COSO Framework**

39.  Second, in 1992, the Committee of Sponsoring

Organization of the Treadway Commission ("COSO") published
"Internal Control – Integrated Framework," ("COSO Framework")
which provides a broad framework of criteria against which
companies can evaluate the effectiveness of their internal
control systems.  COSO Framework became the basis for many
existing rules, regulations and laws, and, most recently, was
recognized by the SEC (in its final rule regarding Management's
Reports on Internal Control Over Financial Reporting and
Certification of Disclosure in Exchange Act Periodic Reports, IC-
26068) as the only currently existing internal control evaluation
satisfying the SEC's evaluative standard requirement applicable
in the United States.

　　40.  Highly relevant to the degree of respect and deference
given to the COSO Framework was the expansive and multi-
disciplinary nature of the input, review and assessment reflected
in its creation.  Specifically, the COSO Framework was the
product of a process that solicited the views of a broad base of
corporate executives, legislatures, regulators, academics and
auditors.  In addition, an exposure draft was widely released,
and comments were received, considered and processed in arriving
at the final version.

　　41.  The COSO Framework defines internal control as "a
process, effected by an entity's board of directors, management
and other personnel, designed to provide reasonable assurance

regarding the achievement of objectives" in three categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.  COSO further states that internal control consists of five components:

> ***Control Environment*** – The core of any business is its people – their individual attributes, including integrity, ethical values, and competence – and the environment in which they operate.  They are the engine that drives the entity and foundation on which everything rests.

> ***Risk Assessment*** – The entity must be aware of the risks it faces.  It must set objectives, integrated with the sales, production, marketing, financial and other activities so that the organization is operating in concert.

> ***Control Activities*** – Control policies and procedures must be established and executed to help ensure that the actions identified by management as necessary to address risks to achievement of the entity's objectives are effectively carried out.

> ***Information and Communication*** – Surrounding these activities are information and communication systems.  These enable the entity's people to capture and exchange the information needed to conduct, manage and control its operations.

> ***Monitoring*** – The entire process must be monitored and modifications made as necessary.  In this way, the system can react dynamically, changing as conditions warrant.

42.  The COSO Framework contains separate chapters addressing each internal control component.  Each chapter

concludes with a section concerning evaluation of the effectiveness of the relevant internal control component and gives illustrative examples of key inquiries to be made by the evaluator.  Highlights of these illustrative examples include:

> **Control Environment** – To what extent is there pressure to meet unrealistic short term performance targets and to what extent is compensation based on achieving them?  To what extent is the board or audit committee independent of management?  To what extent is sufficient and timely information provided to the board or audit committee?

> **Risk Assessment** – Are mechanisms to identify risks arising from external sources adequate? Are mechanisms to identify risks arising from internal sources adequate?  Is the risk analysis process, including estimating the significance of risks, assessing the likelihood of their occurring and determining needed actions, adequate?

> **Control Activities** – Have appropriate policies and procedures been designed and implements relative to the risks identified and assessed in the risk assessment process?

> **Information and Communication** – Is information provided to the right people in sufficient detail and on time to enable them to carry out their responsibilities efficiently and effectively?  Have channels of communication been established for people to report suspected improprieties?

> **Monitoring** – Are internal audit activities effective?  Is the entity responsive to internal and external auditor recommendations on means to strengthen internal controls?

43.  Most importantly, the COSO Framework recognizes that: "an active and involved board of directors . . . possessing an

appropriate degree of management, technical and other expertise
couples with the necessary stature and mind set so that it can
adequately perform the necessary governance, guidance and
oversight responsibilities . . . is critical to effective
internal control." One key environment factor that creates a
temptation for employees to engage in improper acts is "[a]n
ineffective board of directors that does not provide objective
oversight of top management." Moreover, "an unassertive or
ineffective board or audit committee can provide opportunities
for indiscretions."

44. The COSO Framework also states that the duty of a
company's CEO, who has "ultimate ownership responsibility for the
internal control system," is to ensure that "all of the
components of internal control are in place," and that "the CEO
[is] ultimately accountable to the board." The board itself must
satisfy itself that the internal control system is reasonably
designed and operates effectively. The COSO Framework states
that "[e]ffective boards and audit committees [must] determine
whether the internal control system has the necessary critical
underpinning," that "[m]embers of the board should discuss with
senior management the state of the entity's internal control
system[,] provide oversight as needed [, and] seek input from the
internal and external auditors," and that the "audit committee,
in conjunction with or in addition to a strong internal audit

function, is often in the best position within an entity to

identify and act in instances where top management overrides

internal controls or otherwise seeks to misrepresent reported

financial reports."

45. The COSO Framwork further provides that:

> Management is accountable to the board of
> directors or trustees, which provides
> governance, guidance, and oversight. By
> selecting management, the board has a major
> role in defining what it expects in integrity
> and ethical values, and can confirm its
> expectations through its oversight
> activities. Similarly, by reserving
> authority in certain key decisions, the board
> can play a role in high-level objective
> setting and strategic planning, and with the
> oversight that the board provides, the board
> is involved pervasively in internal control.
>
> Effective board members are objective,
> capable, and inquisitive. They have working
> knowledge of the entity's activities and
> environment and commit the time necessary to
> fulfill their board responsibilities. They
> should utilize resources as needed to
> investigate any issues they deem important,
> and have an open and unrestricted
> communications channel with all entity
> personnel, including the internal auditors,
> and with the external auditors and legal
> counsel.

46. One of the basic concepts set forth in the COSO

Framework – and perhaps the most crucial in terms of highlighting

the necessity of active involvement and oversight by a company's

board – is that internal controls may be circumvented by

management:

> The term "management override" is used here

> [in the COSO Framework] to mean overruling
> prescribed policies or procedures for
> illegitimate purposes with the intent of
> personal gain or enhanced presentation of an
> entity's financial condition or compliance
> status . . . . [A]ctions to override usually
> are not documented or disclosed, with an
> intent to cover up the actions.

47.  Thus, the COSO Framework repeatedly emphasizes the
critical importance of the role of directors, functioning in an
audit committee or as the full board, in conjunction with a
strong internal audit function, to identify and act in instances
where top management overrides internal controls.  It identifies
management override as one instance in which the "audit committee
or board must carry its oversight role to the point of directly
addressing serious events or conditions."

**Caremark**

48.  Additionally, the decision of the Delaware Court of
Chancery in In re Caremark International, Inc., Derivative
Litigation, Del. Ch., 968 A.2d 959 (1996) further focused
attention of corporate legal advisers, commentators and directors
on the compliance oversight responsibilities of corporate boards.
In that decision, the Court of Chancery opined that within the
general legal and regulatory framework affecting public company's
in 1996, a corporate board has responsibility to assure that
management has established information and reporting systems to
provide senior management and the board with material information
concerning the corporation's compliance with applicable statutes

27

and regulations:

> I note the potential impact of the federal
> organizational sentencing guidelines on any
> business organization.  Any rational person
> attempting in good faith to meet an
> organizational governance responsibility
> would be bound to take into account this
> development and the enhanced penalties and
> the opportunities for reduced sanctions it
> offers.

49.   Thus, by 1996, directors of Delaware corporations were on plain notice that performance of their fundamental duty of good faith required that management had established a reasonably designed and effectively operating corporate compliance system, and that this compliance system was designed to, and could be expected to, provide the board or an appropriate committee with sufficient, timely and accurate information to enable them to fulfill their oversight responsibilities.

**Sarbanes-Oxley**

50.   In the wake of the 2001 Enron collapse, issues of internal control and compliance – and particularly, the responsibilities of corporate directors with respect to these matters – has received renewed and intense legislative, regulatory, industry and public scrutiny.  A senate investigation into the Enron situation led to publication of a July 2002 report laying a significant part of the blame for the Company's collapse on the failure of the directors to take appropriate action to address known risks.  This report led to enactment of the

28

Sarbanes-Oxley Act of 2002.

51.  Among the Sarbanes-Oxley Act's key provisions include:

Requiring companies to establish an Audit
committee of the Board, consisting entirely
of independent directors.

Requiring companies to disclose the name of
at least one Audit Committee member who is a
"financial expert," or to publicly explain
why the committee includes no such member.[1]

Requiring officers signing annual and
quarterly reports to certify, among other
things, that they have disclosed to the Audit
Committee all significant deficiencies in the
design or operation of the company's internal
controls which could adversely affect the
company's ability to record process summarize
and report financial data, as well as any
fraud, material or not, that involves
management or other employees who have a
significant role in the company's internal
controls.

Requiring each annual report to contain an
internal control report stating the
responsibility of management and maintaining
an adequate internal control structure and
procedures for financial reporting and
containing an assessment, as of the end of
the most recent fiscal year, of the
effectiveness of the internal control
structure, which assessment must be attested
to by the company's independent auditor in
connection with its audit report.

These provisions make clear that federal law directly places upon

---

[1]      The SEC's final rules regarding this requirement, effective March
3, 2003, define the term "audit committee financial expert" as having all five
of the following attributes: (i) Understands GAAP and financial statements;
(ii) Can apply GAAP to estimates, accruals and reserves; (iii) Has personal
experience or has supervised those with experience in preparing auditing,
analyzing or evaluating financial statements of a breadth and complexity
comparable to the breadth and complexity of the company's financial
statements; (iv) Understands internal controls and financial reporting
procedures; and (v) Understands audit committee functions.

directors of public companies a duty to actively oversee internal controls.

**Revisions to Sentencing Guidelines**

52.  Other regulatory and law enforcement action since 2001 has clearly emphasized director responsibility for oversight of compliance programs.  For example, revisions to the Sentencing Guidelines, to be effective November 1, 2004 address the role of the organization's "governing authority" – in most cases, a board of directors – in an effective compliance program:

> The organization's governing authority shall be knowledgeable about the content and operation of the program to prevent and detect violations of law and shall exercise reasonable oversight with respect to the implementation and effectiveness of the program to prevent and detect violations of the law.

> Specific individual(s) within the high level personnel of the organization shall be assigned direct, overall responsibility to ensure the implementation and effectiveness of the program to prevent and detect violations of law.  Such individual(s) shall be given adequate resources and authority to carry out such responsibility and shall report on the implementation and effectiveness of the program to prevent and detect violations of law directly to the governing authority or an appropriate subgroup of the governing authority.

53.  These revisions were intended to clarify the already-existing compliance responsibilities of: (1) members of the governing authority; (ii) executive leadership; and (iii) individuals having primary responsibility for the compliance

program.  Explaining the revised standard, the Advisory Group
wrote:

> [T]he current total silence in the
> organization sentencing guidelines relating
> to the role of the governing authority fails
> to state what may otherwise be obvious:
> ultimately the governing authority is
> responsible for the activities of the
> organization.  It can only perform this
> function if its members are actively involved
> in compliance reviews and reasonably educated
> about the business of the organization and
> the legal and fiduciary duties of the
> governing authority members.

## Revised Principles of Federal Prosecution

54.  In January 2003, the Justice Department issued a
revised Principles of Federal Prosecution of Business
Organizations.  Like the original principles issued in 1999,
these revises principles list the existence of an effective
corporate compliance program as an important consideration for
prosecutors in making charging decisions.  However, the revised
principles go far beyond the original principles in emphasizing
the responsibility of directors to oversee a corporate compliance
program, making explicit reference to the Caremark case.

55.  The revised principles list as questions the prosecutor
may consider:

> Do the corporation's directors exercise
> independent review over proposed corporate
> actions rather than unquestioningly ratifying
> officers' recommendations.
>
> Are the directors provided with information
> sufficient to enable the exercise of

31

independent judgment?

Have the Directors established an information
and reporting system in the organization
reasonably designed to provide management and
the board with timely and accurate
information sufficient to allow them to reach
an informed decision regarding the
organization's compliance with the law?

56.  Recognizing that all these reforms are relevant to the
issue of a director's good faith, former Delaware Chief Justice
Norman Veasey, in prepared remarks to the National Association of
Corporate Directors on October 21, 2003, stated:

[B]oards should be told that it is arguable –
but not settled – that the issue of good
faith may be measured not only by the
evolving expectations of directors in the
context of Delaware common law fiduciary
duty, but it also may well be measured
against the backdrop of relevant Sarbanes-
Oxley SEC Rules and the SRO requirements. ...
That is, when and if these reforms are
presented as part of a board's conduct in a
Delaware court where that conduct is
relevant, adherence to these reforms may be
relevant and would be advisable.

57.  Clearly, in light of all the aforementioned focus on
internal controls and compliance, the good faith of directors
must be measured in the context of specific facts bearing upon
their conduct, and, for directors responsible for the governance
of publicly traded companies in the United States, the general
regulatory environment within which they operate includes, among
other things, the Sentencing Guidelines, Sarbanes-Oxley, and
related regulations and SRO listing rules, as well as best

practices in the internal control founded upon the COSO
Framework.  Clearly, shareholders in publicly traded companies
have a right to expect that directors will take into account
these laws, regulations, and rules relating to the company
governance.

**Knowledge of Express Scripts' Compliance System**

58.  Express Scripts' 2003 and 2004 Proxy stated that the
Audit Committee:

> The primary function of the Audit Committee is to
> assist the Board of Directors in its oversight of
> the Company's financial reporting processes.
> Management is responsible for the Company's
> financial statements and overall reporting
> process, including the system of internal
> controls. The independent auditors are responsible
> for conducting annual audits and quarterly reviews
> of the Company's financial statements and
> expressing an opinion as to the conformity of the
> annual financial statements with generally
> accepted accounting principles.

59.  Express Scripts' 2004 Proxy also stated that the
Governance Committee was responsible reviewing and making
recommendations to the Board regarding the Company's Corporate
Governance Guidelines and the nature and duties of the committees
of the Board, and developing and recommending to the Board a code
of conduct and ethics and consider requests for waivers from such
code.

**The Individual Defendants Fully Recognized The
Highly Regulated Environment In Which The Company Operated**

60.  The importance of assuring legal and regulatory

compliance to the Company continued operation was clearly spelled

out in repeated Company public filings with the SEC, particularly

the Form 10-K – a critical document reviewed and approved by the

Board each year before its public dissemination, and signed by

the Individual Defendants.  For example, Express Scripts' 2002

and 2003 Forms 10-K all stated that:

> Many aspects of our businesses are regulated
> by federal and state laws and regulations.
> Since sanctions may be imposed for violations
> of these laws, compliance is a significant
> operational requirement.  We believe we are
> operating our business in substantial
> compliance with all existing legal
> requirements material to the operation of our
> businesses.

61.  Despite Express Scripts' repeated public assurances

regarding the nature and scope of compliance oversight and

control systems in place, however, as detailed herein, at least a

majority of the Individual Defendants breached their fiduciary

duties by intentionally or recklessly permitting or acquiescing

in the institution and perpetuation of facially inadequate and

defective oversight and compliance control systems at Express

Scripts.

### SUBSTANTIVE ALLEGATIONS

62.  One of the largest PBM companies in the United States,

Express Scripts has more than 50 million members in the United

States and Canada.  The Company's members have access to a

network of more than 55,000 retail pharmacies, seven mail-order

pharmacies, and an online pharmacy.  Express Scripts' customers
include HMOs and other health insurers, self-insured businesses,
and union benefit plans.  Unlike many other pharmacy benefit
management companies, Express Scripts is not controlled by a
large pharmaceutical manufacturer or drug retailer which allows
Express Scripts to contract with more retailers, and buy direct
from manufacturers.  This ability also motivated the Company to
inappropriately change the drugs for customers.  Express Scripts
was formed in 1986 by drugstore chain Medicare-Glaser and HMO
Sanus, and began managing third-party programs in 1988 and later
developed other operations: mail-order prescription, infusion
therapy, and vision services.  In 1992, Express Scripts went
public.  The next year the Company formed subsidiary Practice
Patterns Science to begin profiling providers and tracking
treatment outcomes.  In the late 1990s, the Company continued to
expand, adding customers in Canada (1996) and building
operations.  In 1998 it bought Columbia/HCA's (now HCA) ValueRx
unit, and in 1999, Express Scripts bought SmithKline Beecham's
Diversified Pharmaceutical Services ("DPS").  However, it lost
DPS's largest customer when United Healthcare began moving its
more than 8 million enrollees to Merck-Medco in 2000.  In 2000
Express Scripts had to write down its 20% interest in online
pharmacy PlanetRx.  It had bought into the company in 1999, when
dot-coms were soaring, transferring its own Internet pharmacy

35

operations (YourPharmacy.com) into the fledgling company.  In
2001, the Company acquired Phoenix Marketing Group, one of the
country's biggest prescription drug sample fulfillment companies.
In 2002, the Company acquired National Prescription
Administrators, the largest private PBM company in the country.

63.  At the beginning of the Relevant Period, Defendants
were preparing to make another large acquisition, that of
CuraScript – one of the nation's largest specialty pharmacy
companies.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE RELEVANT PERIOD

64.  On October 29, 2003, the Company issued a press release
entitled "Express Scripts Reports Record Third Quarter Earnings."
The press release stated in part:

> Express Scripts, Inc. announced third quarter
> net income of $64.5 million, or $0.81 per
> diluted share, an increase of 21 percent over
> $0.67 per diluted share reported for the same
> quarter of 2002.
>
> The Company generated $160.8 million of cash
> flow from operations in the third quarter
> compared with $91.4 million in the same
> quarter last year.  This increase in cash
> flow reflects improved operating results and
> working capital management, including
> improved inventory management resulting from
> implementing a new wholesale purchasing
> agreement.  During the third quarter, the
> Company repurchased 530,000 shares of common
> stock for $33.8 million and repaid $25.0
> million of debt.
>
> "While the PBM competitive landscape
> continues to evolve, the one thing that has

remained constant is our focus on making prescription drugs safer and more affordable," stated Barrett Toan, chairman and chief executive officer.  "We have revitalized our business model in 2003 to ensure that our clients understand that our interests are unequivocally aligned with theirs.  This revitalization resulted in Express Scripts no longer accepting pharmaceutical manufacturer funding for programs promoting the use of specific drugs. This revitalization differentiates our business model in the marketplace, and positions Express Scripts as a leader with the most value to offer to plan sponsors and their members."

"The Express Scripts business model has resulted in reduced gross profit and selling, general and administrative expenses this year attributable to the elimination of this pharmaceutical manufacturer funding. However, we believe our business strategy will yield long-term benefits, clearly differentiating Express Scripts from the competition, which has already allowed us to gain market share.  Express Scripts' Client Pledge, issued earlier this year, underlines our commitment to aggressively promote the use of generic drugs, support the use of clinically appropriate lower-cost brand-name drugs, and never recommend switching a member to a higher cost drug."

"In addition to our business model, our industry-leading generic utilization rate, superior formulary management of low-cost brand drugs, and highly-efficient, cost-effective mail pharmacy services are also strong competitive differentiators, and reflect the alignment of our interests with our plan sponsors and their members."

*   *   *

"We have taken our business model to the specialty drug space to help our clients manage the costs and benefits associated with

37

high-cost biotech and injectable drugs, with
growing results," added Toan.  The Company's
specialty PBM business, which it offers to
its PBM clients, is client-centric, and its
claims are included in the PBM mail order and
network claims.  "Our goal is to provide the
same type of value in specialty pharmacy that
we provide in the PBM arena," noted Toan.
Specialty distribution service ("SDS")
claims, which include products targeted to
specific physicians or patient populations,
increased to 0.9 million, a 13 percent
increase over last year's third quarter.

65.  On February 24, 2004, the Company issued a press

release entitled "Express Scripts Reports Strong Fourth Quarter

Earnings." The press release stated in part:

Express Scripts, Inc. announced net income of
$67.4 million, or $0.86 per diluted share for
the fourth quarter, and $249.6 million, or
$3.16 per diluted share for 2003.  This
compares with net income of $56.7 million, or
$0.72 per diluted share for the fourth
quarter of 2002, and $202.8 million, or $2.55
per diluted share for 2002.  This represents
increases of 19 percent and 24 percent in per
share amounts for the fourth quarter and
full-year 2003, respectively.

A record $176.5 million of cash flow from
operations was generated in the fourth
quarter compared with $139.0 million in the
same quarter last year.  The increase in cash
flow reflects improved operating results and
working capital management, including a
reduction of inventory levels resulting from
implementing a new wholesale purchasing
agreement.  During the fourth quarter, the
Company repurchased 1.1 million shares of
common stock for $64.0 million, and to date,
Express Scripts has repurchased 8.1 million
shares under its 10 million share repurchase
program.  For the full year, Express Scripts
generated $457.9 million of cash flow from
operations compared to $426.0 million in

2002.

"As we close the books on 2003, we believe we
are well-positioned for 2004 and beyond,"
stated Barrett Toan, chairman and chief
executive officer.  "Our business model,
which aligns our interests with those of our
clients and members in making prescription
drugs more affordable, differentiates us in
the marketplace and contributed to strong new
sales.  Our recently announced alliance with
the National Association of Chain Drug Stores
to seek endorsement of a jointly-sponsored
Medicare discount card demonstrates our
commitment to making the use of drugs safer
and more affordable for Medicare
beneficiaries."

"The recent addition of CuraScript to the
Express Scripts' family enhances our
competitive positioning by increasing our
ability to provide comprehensive clinical
services for many diseases and improving the
quality and afford ability of specialty drug
therapy for clients and patients, allowing us
to offer our clients a cost effective,
single-source solution for drugs."

66.  On April 28, 2004, the Company issued a press release

entitled "Express Scripts Reports Strong First Quarter Earnings."

The press release stated in part:

Express Scripts, Inc. announced first quarter
net income of $70.0 million, or $0.89 per
diluted share, a 20 percent increase over
$0.74 per diluted share reported for the same
quarter of 2003.  The Company generated $97.8
million of cash flow from operations in the
first quarter compared with $94.4 million in
the same quarter last year.

"We are pleased by our strong start in 2004,
and our outlook for the future," stated
Barrett Toan, chairman and chief executive
officer.  "The record level of mail and
generic utilization this quarter demonstrates

39

the increased demand for our PBM tools, which
help clients reduce their drug trend.
Members covered by step therapy programs have
more than doubled from last year to over 10
million, and clients implementing these
programs experience, on average, a two
percent increase in generic utilization.  Our
business model aligns our interests with our
clients and members, and we benefit when our
members use more generics, choose preferred
lower-cost brand drugs and take advantage of
our cost-effective mail services."

"This quarter, we also completed the
acquisition of CuraScript, which is providing
immediate benefits by improving the quality
and affordability of specialty drug therapy
for clients and patients."

67.  On July 28, 2004, the Company issued a press release

entitled "Express Scripts Reports Second Quarter Earnings."  The

press release stated in part:

> Express Scripts, Inc. announced second
> quarter net income of $65.4 million, or $0.83
> per diluted share, which includes charges of
> $0.10 per diluted share resulting from the
> early retirement of debt, and $0.01 per
> diluted share pertaining to the
> implementation of the TRICARE Retail Pharmacy
> ("TRICARE") program for the Department of
> Defense ("DoD").  For the same quarter last
> year, the Company reported net income of
> $59.0 million, or $0.74 per diluted share,
> which included a non-recurring charge of
> $0.04 per diluted share resulting from the
> early retirement of debt.
>
> The Company generated $55.5 million of cash
> flow from operations in the second quarter
> compared with $26.2 million in the same
> quarter last year.  On June 15, 2004, Express
> Scripts redeemed its 5/8% Senior Notes with a
> $204.5 million principal balance at a
> redemption price equal to 104.8125%, and
> recorded additional interest expense of $12.3

million ($7.6 million net of tax), or $0.10
per diluted share.  The redemption will
result in annual interest savings of
approximately $13.5 million ($8.4 million net
of tax), or $0.11 per diluted share.  In
addition, the Company repurchased 554,000
shares of common stock for $42.3 million.

To date, the Company has repurchased 8.8
million shares under its share repurchase
program.  On July 27, 2004, the Company's
Board of Directors increased the authorized
share repurchase program to permit the
Company to purchase up to an additional 5.2
million shares.

"Our results for the quarter reflect
outstanding efforts throughout our
organization," stated Barrett Toan, chairman
and chief executive officer.  "We implemented
a significant amount of new business,
including the TRICARE program, launched the
Pharmacy Care Alliance ("PCA") Medicare
discount card, and achieved record levels of
mail and generic utilization.  The increased
utilization of generics and mail pharmacy
services, including specialty injectables,
reflects the trend for greater management of
the pharmacy benefit, which will translate
into lower costs for our clients and improved
profitability for Express Scripts."

68.  The Company's release also noted investigations into

its practices:

On July 12, 2004, the Company received a
Notice of Proposed Litigation from the Office
of the Attorney General of the State of New
York.  The Notice alleges certain breaches of
contracts and violations of civil law in
connection with the management of the
prescription drug plan for the State of New
York and its employees.  The Notice also
alleges certain violations of civil law in
connection with the Company's therapeutic
interchange programs.  The Company is engaged
in discussions with the Office of the

41

> Attorney General regarding the Notice.
> Express Scripts believes that it has
> administered the state's plan in accordance
> with contractual and legal requirements, and
> that its therapeutic interchange programs
> comply in all material respects with
> applicable law.
>
> On July 21, 2004, the Company received a
> Civil Investigative Demand from the Attorney
> General of the State of Vermont.  The Company
> has been advised that it will receive
> identical subpoenas or civil investigative
> demands from the Attorneys General of 18
> other states.  The Civil Investigative Demand
> seeks documents regarding a wide range of the
> Company's business practices.  The Company is
> cooperating with this investigation.

69.  The Company's stock fell 9 percent after the disclosure

that 19 states and Washington, D.C., were investigating its

business practices.

70.  The Company also announced an increase in its

litigation reserve from $15 million to $20 million.

71.  Then, on August 4, 2004, New York Attorney General

Eliot Spitzer sued the Company, alleging a scheme to improperly

divert funds from its customers to itself.  The Attorney

General's press release stated in part:

### EXPRESS SCRIPTS ACCUSED OF DEFRAUDING STATE
### AND CONSUMERS OUT OF MILLIONS OF DOLLARS

> Attorney General Eliot Spitzer and State
> Civil Service Commissioner Daniel E. Wall
> today announced a lawsuit against Express
> Scripts, Inc., the nation's third largest
> pharmacy benefit manager, for conducting
> elaborate schemes that inflated by millions
> of dollars the costs of prescription drugs to
> New York State's largest employee health

42

plan, the Empire Plan.

*   *   *

The lawsuit, a result of a one-year investigation by Spitzer's office in cooperation with the Department of Civil Service and the Office of State Comptroller (OSC), is being filed today in New York State Supreme Court in Albany County.  The investigation was sparked by audits of Express Scripts conducted by the OSC in 2002. The lawsuit alleges that Express Scripts:

- Enriched itself at the expense of the Empire Plan and its members by inflating the cost of generic drugs;

- Diverted to itself millions of dollars in manufacturer rebates that belonged to the Empire Plan;

- Engaged in fraud and deception to induce physicians to switch a patient's prescription from one prescribed drug to another for which Express Scripts received money from the second drug's manufacturer;

- Sold and licensed data belonging to the Empire Plan to drug manufacturers, data collection services and others without the permission of the Empire Plan and in violation of the State's contract; and

- Induced the State to enter into the contract by misrepresenting the discounts the Empire Plan was receiving for drugs purchased at retail pharmacies.

While pharmacy benefit managers (PBMs), including Express Scripts, have been under increasing scrutiny by federal and state regulators and law enforcement agencies, New York is the first to allege that Express Scripts enriched itself at its client's expense through a complicated pricing scheme.

The scheme hinged on Express Scripts' ability to manipulate its pricing arrangements with its clients.

Express Scripts has two types of pricing arrangements with its clients: "passthrough" and "spread" pricing.  Under "pass-through" pricing (used by the Empire Plan for in-state pharmacies), the amount charged to the Empire Plan for a drug would be the same amount paid by Express Scripts to the pharmacy.  Under "spread" pricing, the plan negotiates a guaranteed price for drugs with Express Scripts.  If Express Scripts can negotiate a lower price with the pharmacy, Express Scripts retains the difference or "spread" between what it pays the retail pharmacy for the drug and what it charges the plan.

Express Scripts developed and carried out a scheme through which it paid certain retail pharmacy chains higher prices for generic drugs for members of plans with "pass-through" pricing, such as the Empire Plan.  These higher prices were then "passed through" to such plans.  Because they were receiving higher prices from Express Scripts for the Empire Plan and other "pass through" plans, these same pharmacy chains accepted lower prices from Express Scripts for the same drugs dispensed to the members of Express Scripts' "spread" plans, where Express Scripts could charge the plan more than it paid the pharmacy.  Thus, Express Scripts employed this scheme to maximize the "spread" that it retained for itself, enriching itself to the detriment of the Empire Plan and its other client plans.

The lawsuit also alleges, that in furtherance of its scheme to divert and retain manufacturer rebates that belonged to the Empire Plan, Express Scripts disguised millions of dollars in rebates as "administrative fees," "management fees," "performance fees," "professional services fees," and other names.

The lawsuit further alleges that the drug
switches caused by Express Scripts often
resulted in higher costs for plans and
members.  For example, Express Scripts
received funding from brand drug
manufacturers to steer members away from less
expensive generic drugs when a brand name
drug was about to be subject to generic
competition.  In the period before the
introduction of the generic, Express Scripts
would switch members from a brand drug losing
patent protection to another made by the same
manufacturer that was not facing generic
competition.  These switch initiatives
increased prescription drug costs for plans
and members, while simultaneously enriching
Express Scripts.

The Empire Plan provides health and
prescription drug coverage for more than one
million active and retired State and local
government employees and their dependants.

In 2003, the Empire Plan spent more that
[sic] $1 billion on prescription drug claims.
The State Department of Civil Service (DCS)
administers the Empire Plan and, since 1998,
has contracted with Connecticut General Life
Insurance Company (CIGNA) to manage the
Plan's prescription drug benefit.  CIGNA,
which is also named as a Defendant in the
State's lawsuit, subcontracts with Express
Scripts to administer the operation of the
program.

Express Scripts is paid a per claim
administration fee for processing the
prescription drug claims of Empire Plan
members.  Express Scripts is also responsible
for negotiating the prices of drugs with
pharmacies that fill prescriptions for Plan
members, and for collecting and passing on to
the Plan any rebates that it receives from
drug manufacturers as a result of Plan
members' use of the manufacturers' drugs.

72.  On this news, Express Scripts' stock dropped to $60.34

per share.

73.   In fact, during the Relevant Period, Defendants were engaging in improperly changing patients' medications.  Moreover, the Company's financial results were false due to the Company's failure to adequately accrue for losses it was incurring through its illegal conduct.

### EXPRESS SCRIPTS' FALSE FINANCIAL REPORTING DURING THE RELEVANT PERIOD

74.   In order to inflate the price of Express Scripts' publicly traded securities, the Company falsely report its results during the Relevant Period through its failure to accrue for litigation claims and other charges associated with its illegal conduct.

75.   The Relevant Period results were included in filings with the SEC.  The results were also included in press releases.

76.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R.  §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures

46

accompanying annual financial statements.   17 C.F.R.

§210.10-01(a).

77.   GAAP, as set forth in FASB Statement of Financial

Accounting Standards ("SFAS"), No. 5, requires that losses be

recorded when the loss is probable and can be reasonably

estimated.   GAAP, as described by FASB Statement of Concepts No.

5, also requires that revenue not be recorded until and unless it

is earned.

78.   The Company recorded income to which it was not

entitled and thus had not earned.   The Company also failed to

record reserves for losses it was incurring due to its illegal

conduct.

79.   Ultimately, Express Scripts increased its reserves for

litigation just for the costs of litigating, and not for the

ultimate resolution of the claims, by 300% to $20 million.

80.   Due to these accounting improprieties, the Company

presented its financial results and statements in a manner which

violated GAAP, including the following fundamental accounting

principles:

a.   The principle that interim financial reporting

should be based upon the same accounting principles and practices

used to prepare annual financial statements was violated (APB No.

28, ¶ 10);

b.   The principle that financial reporting should

provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

c.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

d.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

e.    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions

48

reflect investors' expectations about future enterprise
performance, those expectations are commonly based at least
partly on evaluations of past enterprise performance (FASB
Statement of Concepts No. 1, ¶ 42);

     f.   The principle that financial reporting should be
reliable in that it represents what it purports to represent was
violated.  That information should be reliable as well as
relevant is a notion that is central to accounting (FASB
Statement of Concepts No. 2, ¶¶ 58-59);

     g.   The principle of completeness, which means that
nothing is left out of the information that may be necessary to
insure that it validly represents underlying events and
conditions was violated (FASB Statement of Concepts No. 2, ¶ 79);
and

     h.   The principle that conservatism be used as a
prudent reaction to uncertainty to try to ensure that
uncertainties and risks inherent in business situations are
adequately considered  was violated.  The best way to avoid
injury to investors is to try to ensure that what is reported
represents what it purports to represent (FASB Statement of
Concepts No. 2, ¶¶ 95, 97).

   81.  Further, the undisclosed adverse information concealed
by Defendants during the Relevant Period is the type of
information which, because of SEC regulations, regulations of the

national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

<u>**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**</u>

82.  Plaintiff brings this action derivatively in the right and for the benefit of Express Scripts to redress injuries suffered, and to be suffered, by Express Scripts as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as aiding and abetting thereof, by the Individual Defendants.  Express Scripts is named as nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

83.  Plaintiff will adequately and fairly represent the interests of Express Scripts in enforcing and prosecuting its rights.

84.  Plaintiff is and was an owner of Express Scripts stock during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

85.  The Express Scripts Board at the time of filing of the

this complaint consisted of the following eleven individuals:
defendants Benanav, Borelli, Lahowchic, MacMahon, Parker, Paz,
Skinner, Sternberg, Toan, Waltman and Breen.  Plaintiff did not
make any demand on that Board to institute this action because
such demand would have been a futile, wasteful and useless act,
particularity for the following reasons:

(a)  As a result of their access to and review of
internal corporate documents; conversations and connections with
other corporate officers, employees and directors; and attendance
at management and/or Board meetings, each of the defendants knew
the adverse non-public information regarding the improper
practices of changing patients' medications and thus the improper
accounting which resulted therefrom.  While in possession of this
material adverse non-public information regarding the Company,
the following current member of the Express Scripts Board
participated in the illegal insider selling:

(i)  During the Relevant Period, Waltman sold
25,000 shares of his Express Scripts stock for proceeds of $2
million while in possession of adverse information regarding
Express Scripts.  Because this defendant received a personal
financial benefit from the challenged insider trading
transactions, this defendant is interested and any demand upon
him was futile.

(b)  The Compensation Committee of the Board determined

Express Scripts's executive annual compensation consisting of salaries, bonuses, stock options, long term incentive plans, and other compensation plans.  The Compensation Committee was comprised of defendants Benanav, Lahowchic, and Waltman.  As the members of the Compensation Committee singularly controlled the defendants Paz and Toan's awards, defendants Paz and Toan would not institute this action against defendants Benanav, Lahowchic, and Waltman.  To do so would have jeopardized their personal financial compensation.  Thus, demand on defendants Paz and Toan was futile.

(c)  The principle professional occupation of defendants Paz and Toan is their employment with Express Scripts, pursuant to which they received and continue to receive substantial monetary compensation and other benefits.

(i)  Express Scripts paid defendant Paz $1,256,071, $920,752, and $1,506,629 for FY:03, FY:02 and FY:01, respectively, in salary, bonus and other compensation. Accordingly, defendant Paz lacks independence from defendants Benanav, Lahowchic, and Waltman, defendants who are not disinterested and who exert influence over defendant Paz's compensation by virtue of their positions as representing the entire Compensation Committee.  This lack of independence rendered defendant Paz incapable of impartially considering a demand to commence and vigorously prosecute this action.

(ii) Express Scripts paid defendant Toan
$2,805,910, $2,235,100, and $2,304,921 for FY:03, FY:02 and
FY:01, respectively, in salary, bonus and other compensation.
Accordingly, defendant Toan lacks independence from defendants
Benanav, Lahowchic, and Waltman, defendants who are not
disinterested and who exert influence over defendant Toan's
compensation by virtue of their positions as representing the
entire Compensation Committee.  This lack of independence
rendered defendant Toan incapable of impartially considering a
demand to commence and vigorously prosecute this action.

(d)  As of March 1, 2004, defendant Toan owned 747,714
shares of Express Scripts.  Further, the number of securities
underlying his unexercised options at the year ended 2003
exercisable/unexercisable were 492,267/168,533.  The value is
$32,701,297/$11,195,647.  Thus, defendant Toan had every
incentive to participate in the false and misleading statements
and other illegal practices, including the improper practices of
changing patients' medications described herein, in order to
effectuate a commensurate rise in Express Scripts' stock price.

(e)  As of March 1, 2004, defendant Benanav owned
22,000 shares of Express Scripts.  Further, Benanav is also
director and holds various executive positions with New York Life
and/or NYLife.  New York Life Insurance Company owns 15.03% of
Express Scripts common shares.  Thus, defendant Benanav had every

incentive to participate in the false and misleading statements and other illegal practices, including the improper practices of changing patients' medications described herein, in order to effectuate a commensurate rise in Express Scripts' stock price.

(f)  As of March 1, 2004, defendant Borelli owned 77,520 shares of Express Scripts.  Thus, defendant Borelli had every incentive to participate in the false and misleading statements and other illegal practices, including the improper practices of changing patients' medications described herein, in order to effectuate a commensurate rise in Express Scripts' stock price.

(g)  As of March 1, 2004, defendant Paz owned 177,024 shares of Express Scripts.  Further, the number of securities underlying his unexercised options at the year ended 2003 exercisable/unexercisable were 121,234/19,866.  The value is $4,738,983/$1,583,160.  Thus, defendant Paz had every incentive to participate in the false and misleading statements and other illegal practices, including the improper practices of changing patients' medications described herein, in order to effectuate a commensurate rise in Express Scripts' stock price.

(h)  As of March 1, 2004, defendant Sternberg owned 27,000 shares of Express Scripts.  Further, Sternberg is also director and holds various executive positions with New York Life and/or its subsidiaries.  New York Life Insurance Company owns

15.03% of Express Scripts common shares.  Thus, defendant
Sternberg had every incentive to participate in the false and
misleading statements and other illegal practices, including the
improper practices of changing patients' medications described
herein, in order to effectuate a commensurate rise in Express
Scripts' stock price.

(i)  As of March 1, 2004, defendants Lahowchic,
MacMahon, Parker, and Waltman owned thousands of Express Scripts
shares.  Specifically, defendant Lahowchic owned 10,334 shares;
defendant MacMahon owned 13,834 shares; defendant Parker owned
11,334 shares; and defendant Waltman owned 78,000 shares.  Thus,
these defendants had every incentive to participate in the false
and misleading statements described herein in order to effectuate
a commensurate rise in Express Scripts' stock price

(j)  According to Express Scripts's Definitive Notice
and Proxy Statement filed with the SEC on or about April 16,
2004, defendants Borelli and MacMahon were, during the Relevant
Period, members of the Audit Committee.  The Audit Committee is
responsible for reviewing and approving external and internal
auditors and fees, and reviewing results and scope of any audit
conducted, monitoring and overseeing internal controls and
financial reporting processes as well as updating and
implementing the Company's Code of Conduct.  The Audit Committee
recommended that the Board include the improper audited

consolidated financial statements in the Express Scripts 10-Ks, 10-Qs, and press releases for the Relevant Period.  By such actions, defendants Borelli and MacMahon breached their duties by causing or allowing the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them was futile;

(k)   According to Express Scripts's Definitive Notice and Proxy Statement filed with the SEC on or about April 16, 2004, defendants Borelli, Parker, Sternberg, and Waltman were, during the Relevant Period, members of the Corporate Governance Committee.  The Corporate Governance is responsible for (i) establishing criteria for membership of the Company's Board of Directors and its committees; (ii) selecting and nominating candidates for election or reelection as directors at the Company's annual stockholders' meeting; (iii) considering stockholder recommendations for and nominations of candidates for election as directors; (iv) recommending candidates to fill any vacancies on the Board of Directors; (v) reviewing and making recommendations to the Board regarding the Company's Corporate Governance Guidelines and the nature and duties of the committees of the Board; (vi) approving and making adjustments to the Company's policies regarding compensation of Directors; and (vii) developing and recommending to the Board a code of conduct and ethics and consider requests for waivers from such code.  By such

56

actions, defendants Borelli Parker, Sternberg, and Waltman
breached their duties by causing or allowing the improper
financials described above.  As a result of these defendants'
breach of their duties, any demand upon them was futile.

(l)   Several of the Audit Committee members have
special skill, knowledge and experience that they were duty bound
to bring to bear, in their roles as directors and members of the
Audit Committee, for the benefit of Express Scripts and its
shareholders.

(i)   Defendant Borelli, as noted above,
through his prior services at M&MC had extensive, high-level
executive management experience in the fiduciary insurance
brokerage business, and a sophisticated understanding of risk
management principles bearing upon, among other things,
operational risk management and compliance issues.

(ii) Defendant MacMahon is also a director of
LabCorp, the second largest independent clinical laboratory
company in the U.S., since January 1997.  Pursuant to his broad
experience, MacMahon has developed and acquired special
knowledge, skill and experience that he was duty-bound to bring
to bear on his role as a Express Scripts director and as a member
of the Audit Committee, for the benefit of Express Scripts and
its shareholders.

(m)   Defendant Benanav is a Director of the Company

57

since 2000.  He is also Vice Chairman and Executive Officer New
York Life Insurance Company, Executive Vice President of New York
Life from December 1997 until November 1999, and a director of
New York Life and Barnes Group, Inc.  Pursuant to his broad
experience, Benanav has developed and acquired special knowledge,
skill and experience that he was duty-bound to bring to bear on
his role as a Express Scripts director for the benefit of Express
Scripts and its shareholders.

(n)  Defendant Skinner is President, Chief Executive
Officer and a director of USF from 2000 until his retirement in
2003.  Defendant Skinner was also Chairman of the Board of USF
from 2001 until his retirement.  From October 1998 through 2000,
defendant Skinner served as Capital Partner & Co-Chairman of
Hopkins & Sutter, a Chicago-based law firm.  Defendant Skinner is
also a director of Navigant Consulting, Inc., Midwest Air Group,
Inc., Click Commerce, Inc., DiamondCluster International, Inc.,
Dade Behring Holdings, Inc., and APAC Customer Service, Inc.
Pursuant to his broad and senior executive management experience,
defendant Skinner has developed and acquired special knowledge,
skill and experience that he was duty-bound to bring to bear on
his role as a Express Scripts director and as a member of the
Compliance Committee, for the benefit of Express Scripts and its
shareholders.

(o)  Defendant Sternberg is the Chairman and Chief

Executive Officer of New York Life Insurance Company, and has
served in this capacity since April 1997.  From October 1995
until October 2002, he was the President of New York Life, and
from October 1995 until March 1997 he also held the position of
Chief Operating Officer of New York Life.  Defendant Sternberg is
also a director/manager of various New York Life subsidiaries.
Pursuant to her broad and senior executive management experience,
defendant Sternberg has developed and acquired special knowledge,
skill and experience that she was duty-bound to bring to bear on
his role as a Express Scripts director and as a member of the
Compliance and Corporate Governance Committees, for the benefit
of Express Scripts and its shareholders.

   (p)  Finally, each member of the Audit Committee, the
Compliance Committee and the Corporate Governance Committee was
aware of the special experience, knowledge and skill of each
other committee member, and the committee as a whole was duty
bound to draw upon such special knowledge, skill and experience
to assure that it was rigorously and effectively performing its
internal control and compliance oversight role.  In particular,
to be assured that oversight of Express Scripts compliance was
effectively overseen, the Audit Committee, the Compliance
Committee and the Corporate Governance Committee should have
drawn upon defendants Borelli's and Benanav's oversight
expertise, upon Skinner's and MacMahon's senior executive

management expertise, and upon Borelli's financial and senior executive management experience.

(q)   All of the Individual Defendants had both general and direct notice of specific events and occurrences that revealed the clear and essential requirement for rigorous scrutiny of compliance by Express Scripts and its professional personnel.

(r)   In addition to such general notice, members of the Board of Express Scripts also received clear warnings of both potential and actual misconduct within Express Scripts that reasonably put them on direct notice of potential conflicts of interest and breaches of fiduciary duty.

(s)   Defendant Toan, as Chairman and CEO of Express Scripts, has full familiarity with and responsibility for Express Scripts' systems of internal control, including its policies and procedures for providing assurance that all operations of the Company and its operating subsidiaries are conducted in a manner that is fully compliant with all applicable law, regulations, and standards of conduct, including fiduciary duties owed to third parties by Express Scripts and its operating  subsidiaries.  This professional experiences impose an awareness on Toan's part of the special compliance risks attendant to operating in highly regulated lines of business involving heightened fiduciary responsibilities and obligations.

(t)   The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein;

(i)   Defendants Sternberg and Benanav are directors and hold various executive positions with New York Life and/or its subsidiaries.  New York Life Insurance Company owns 15.03% of Express Scripts common shares.  Accordingly, defendants Sternberg and Benanav cannot exercise independent judgment in deciding whether to bring this action or whether to vigorously prosecute this action because they have an interest in safeguarding the status of New York Life's investment with the Company;

(u)   In order to bring this suit, all of the directors of Express Scripts would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(v)   The acts complained of constitute violations of the fiduciary duties owed by Express Scripts' officers and directors and these acts are incapable of ratification;

(w)   Each of the Individual Defendants of Express Scripts authorized and/permitted the false statements disseminated directly to the public or made directly to

61

securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(x)  Any suit by the current directors of Express Scripts to remedy these wrongs would likely expose the Individual Defendants and Express Scripts to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(y)  Express Scripts has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Express Scripts any part of the damages Express Scripts suffered and will suffer thereby.

86.  If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities laws, which

admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do.  Thus, demand is futile.

87.  If Express Scripts' officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance, they cause the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Express Scripts.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Express Scripts against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Express Scripts, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a

63

suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Express Scripts to sue them, since they will face uninsured liability.

88.  Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Express Scripts for any of the wrongdoing alleged by plaintiff herein.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

89.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.  The Individual Defendants owed and owe Express Scripts fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Express Scripts the highest obligation of good faith, fair dealing, loyalty and due care.

91.  The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.  Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and artificially inflated levels through the issuance of false and misleading statements and other illegal practices, including, but not limited to, the Company's violation of civil law by pocketing rebates it obtained from drug companies instead of returning them to the State of New York and inflating the cost of generic drugs and inducing physicians to switch patients' prescriptions so it could charge fees to new drug providers.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

93.  As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Express Scripts has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

94.  Plaintiff on behalf of Express Scripts has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against All Defendants for Abuse of Control

95.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Express Scripts, for which they are legally responsible.

97.  As a direct and proximate result of the Individual Defendants' abuse of control, Express Scripts has sustained significant damages.

98.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

99.  Plaintiff on behalf of Express Scripts has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against All Defendants for Gross Mismanagement

100. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Express Scripts in a manner consistent with the operations of a publicly held corporation.

102. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Express Scripts has sustained significant damages in

excess of hundred of millions of dollars.

103. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

104. Plaintiff on behalf of Express Scripts has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Against All Defendants for Waste of Corporate Assets**

105. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, The Individual Defendants have caused Express Scripts to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

107. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

108. Plaintiff on behalf of Express Scripts has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**

### Against Defendants Paz, Toan, and Waltman for Unjust Enrichment

109. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110. By their wrongful acts and omissions, defendants Paz, Toan and Waltman were unjustly enriched at the expense of and to the detriment of Express Scripts.

111. Plaintiff, as a shareholder and a representative of Express Scripts, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongdoing conduct and fiduciary breaches.

### PRAYER FOR RELIEF

**WHEREFORE,** plaintiff demands judgment as follows:

(A)  Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

(B)  Requiring the Individual Defendants to return to Express Scripts all salaries, payments and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to

Express Scripts;

        (C)  Directing the Individual Defendants to establish and maintain effective compliance programs to ensure that Express Scripts' affiliates and employees do not engage in wrongful and illegal practices;

        (D)  Directing the Individual Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of defendants' culpable conduct;

        (E)  Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

        (F)  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

    Plaintiff demands a trial by jury.

Dated: November 1, 2004

                             **GAINEY & MCKENNA**


                         _____
                         Thomas J. McKenna
                         485 Fifth Avenue
                         New York, New York 10017
                         Tel: (212) 983-1300

                         **Attorneys for Plaintiff**